**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Clinton Olsen, | No. CV-15-01004-PHX-JJT |
| Plaintiff, | **ORDER** |
| v. | |
| Pacific Indemnity Company, *et al.*, | |
| Defendants. | |

At issue is Plaintiff's Motion for New Trial (Doc. 109), to which Defendant filed a Response in opposition (Doc. 115) and in support of which Plaintiff filed a Reply (Doc. 117). No party requested a hearing on the Motion and the Court finds oral argument would not assist in its resolution. LRCiv 7.2(f).

The parties tried Plaintiff's breach of contract claim to a jury over five days in October 2017.[1] At trial, counsel for both parties ably and professionally presented and argued the evidence available to them; the Court notes the fine quality of the advocacy by all counsel. The jury returned a verdict for Defendant. Plaintiff bases his motion for new trial on the premise that the Court should not have allowed certain evidence about his investments in medical marijuana dispensaries because that evidence unfairly prejudiced him in the eyes of the jury. Plaintiff seeks "a new trial that excludes evidence beyond the fact that he had investments in the medical marijuana business and where he is not

---

[1] The Court previously had granted summary judgment to Defendant on Plaintiff's companion claim for breach of the duty of good faith and fair dealing (Count II) and his claim for punitive damages. (Doc. 58).

compelled to answer questions about his investments or explain how he invested in a not-for-profit business." (Doc. 117 at 4.)[2] For the reasons set forth below, the Court will deny the Motion.

**I.    Legal Standard**

Rule 59 provides a district court the discretion to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "Rule 59 does not specify the grounds on which a motion for a new trial may be granted;" thus courts are "bound by those grounds that have been historically recognized." *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003). The Ninth Circuit has held that "[t]he trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (citation omitted). A motion for new trial "may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence" by the trial court. *Montgomery Ward & Co., v. Duncan*, 311 U.S. 243, 251 (1940). The authority to grant a new trial is "confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980).

Where a motion for new trial is predicated on an assignment of error in the admission of evidence before the jury, the court should grant the motion only if it finds 1) evidence has been improperly admitted; and 2) the admission of such evidence resulted in prejudice to the party moving for a new trial. *See, e.g.*, *United States v. 4.85 Acres of Land*, 546 F.3d 613, 617 (9th Cir. 2008). The first element—whether the evidence at issue was improperly admitted—is evaluated by an abuse of discretion standard. *Id.* A district court in rendering an evidentiary ruling abuses its discretion when

---

[2] Plaintiff's statement of the relief he seeks in a new trial and the corresponding breadth of the error he charges differs within the briefing. In his Motion, Plaintiff appears to assign as error the allowance of any mention of his investments in medical marijuana dispensaries, but he narrows the assignment of error in his Reply brief only to the Court's compelling him to answer questions requiring the details of his investments, such as how he invested and through whom. The Court treats with both formulations of the assigned error.

> it makes an error of law, when it rests its decision on clearly erroneous findings of fact, or when we are left with the definite and firm conclusion that the district court committed a clear error of judgment.

*Id*. The second element—a finding of prejudice—requires a finding that "the court's error more probably than not [] tainted the verdict." *Estate of Barabin v. Astenjohnson, Inc*., 740 F.3d 457, 464 (9th Cir. 2014) (internal citations and quotations omitted).

**II.    Analysis**

     **A.    Prejudice**

The Court starts with the second element and concludes that even if the admission of evidence related to Plaintiff's purported investment in Arizona medical marijuana dispensaries constituted an abuse of discretion, it did not taint the verdict and therefore did not constitute prejudice to Plaintiff. The Ninth Circuit has held that "prejudice is at its apex when the district court erroneously admits evidence that is critical to the proponent's case." *Barabin*, 740 F.3d at 465. The evidence Plaintiff charges as wrongly admitted was anything but critical to Defendant's case.

Plaintiff made a claim against his homeowners' insurance policy to cover a reported burglary and theft of nearly $170,000 worth of jewelry. When Defendant did not cover the claim, Plaintiff sued for breach of the insurance contract. For Plaintiff to prevail on that claim, the jury had to find that, among other things, the claimed loss actually occurred—in other words, that he owned the jewelry and it was actually stolen.

Plaintiff told the jury that he had purchased all the jewelry at issue, and when it was stolen, it was in an electronic safe which was locked and hidden under a blanket in his garage and for which only he knew the combination. He also testified that his home was protected by an alarm system monitored by ADT and which was set upon his departure on the evening of he reported a break-in, September 6, 2013. According to Plaintiff's testimony at trial, and his report to Defendant, the burglar breached a dead-bolted French door on Plaintiff's back patio to gain access to the house, proceeded to the garage, uncovered and opened the safe and stole all the jewelry claimed in the loss. Plaintiff

reported to police on the night of September 6 that when he returned home, the alarm was sounding and that is when he called in. The jury also had before it the following to compare against Plaintiff's bare testimony:

The evidence concerning the patio French doors was inconsistent with Plaintiff's testimony that he had engaged the deadbolt before he went out on evening of September 6, 2013. Pictures taken after the burglary show that while there was a crack in the wood near the door latch, about halfway up the door, there was no damage to the deadbolt itself or to any of the wood in the deadbolt area higher up the door. This would be improbable if not impossible if the deadbolt was engaged as Plaintiff testified.

Examination by the police, the claim investigator, and Defendant's safe expert yielded no evidence that anyone tampered with the safe, and it had no physical or electronic damage. The uncontroverted testimony of the safe expert was that there were only three ways to open the safe without damaging or destroying it: 1) using the owner's unique self-set combination; 2) using the factory key unique to the safe; or 3) resetting the safe to the factory code and using that code.

As to the first method, Plaintiff testified that only he had the unique owner code and he did not share it. As to the second, Plaintiff told investigators that he did not recall ever receiving such a key and did not have one, although the expert testified that the maker of the safe at issue did provide a unique key along with each safe at delivery. And as to the third, the expert testified, again without contradiction, that the reset feature could be activated by hitting a reset button inside the safe, and then pressing the factory default code; however, if the safe were closed, the only way someone could hit the reset button would be to shove a firm but thin elongated object, such as a coat hanger or "slim jim" lock opener, between the door seams of the safe and inside the safe to depress the reset button, and that would necessarily leave scratches and other tampering damage. No such damage was found on the safe.

The jury also heard substantial evidence that Plaintiff had manipulated the alarm to support his version of events. ADT records substantiate that on the night of the reported

break-in, it received no signal of any breach of the alarm system from Plaintiff's home, and when Plaintiff called to report the break-in, ADT checked and found no signal was being reported at all from his home. Yet, according to testimony from the ADT technician who was called out to check Plaintiff's alarm the next day, the alarm was enrolled—meaning it had checked in with and was in communication with ADT's monitoring hub—and working properly when he arrived. ADT records introduced at trial also show that shortly before the ADT service technician came to address the issue, Plaintiff's system reestablished contact and enrollment, and then Plaintiff tested the system and called ADT to confirm it was working. Plaintiff never told the tech he had done any of these things.

The ADT technician testified that, in light of the evidence set forth above, the most likely explanation for the alarm's failure to send a signal to ADT monitoring during the alleged break-in was that someone disabled it by both unplugging it and removing the battery, thus defeating both power fail-safes and interrupting its connection to ADT monitoring; and then reinstalled the battery the next day, which caused a re-enrollment as recorded in ADT logs on that date and time. According to the ADT technician's testimony, when an alarm is disabled by cutting power, both plug and battery, no report is made to ADT monitoring as the power is cut and the connection is lost. When the battery and or plug are reengaged, however, the home alarm unit automatically contacts and reenrolls with the ADT monitoring base and that activity produces records at the monitoring site, as it did here. This testimony and explanation were entirely consistent with the unchallenged ADT record evidence before the jury of what happened on September 6 and 7, 2013.

The jury also had before it the troubling difference between what the ADT technician testified to, as confirmed by the ADT records—that system was working fine when the technician arrived, having reenrolled earlier that day, with Plaintiff calling to confirm and test it—and what Plaintiff told Defendant's investigator, which was that the system was not working when the technician arrived and the technician had to fix it. Defendant argued to the jury that Plaintiff wanted Defendant's investigator to believe the alarm was not working until an ADT technician fixed it. Indeed, that explanation would be

far less suspicious to the investigator evaluating a claim of theft than an unexplained alarm failure followed by an unexplained resumption of regular monitoring service.

In addition to the inconsistencies in Plaintiff's account of discovering a burglary, Plaintiff was unable to present to the jury any proof that he had purchased the jewelry at issue, that he owned it, or that he even possessed it at the time of the reported break-in. As for proof of income, and therefore the ability to buy the jewelry claimed, Plaintiff could produce no income statements, pay stubs, employment contracts or personnel records from any employer. He testified he had no such records because he was self-employed in all-cash businesses and those businesses kept no records. When questioned about proof of income or assets via income tax records, Plaintiff answered that neither he nor any of his businesses prepared or filed tax returns for any of the relevant years. The jury did see statements from Plaintiff's personal checking account for 2013, wherein Plaintiff's monthly balance ranged between a high of $3400 and a low of $166. Plaintiff also claimed part ownership in a nightclub, but he produced no records documenting that ownership or any payments pursuant to such an interest. Without proof of income, the jury could easily find Plaintiff did not have the wherewithal to purchase the nearly $170,000 in jewelry.

Nor did Plaintiff present evidence of actual purchase or ownership of the jewelry. The jury saw no receipts, credit card statements, bank withdrawal records or any other evidence documenting the claimed purchases, or any of them. And while Plaintiff asserted that he purchased approximately 90% of the jewelry from a single individual—Mr. Drayton Williams, with whom Plaintiff claimed to have a personal friendship—Plaintiff produced no evidence for the claim investigator or for the jury at trial from the purported seller of any purchases. Mr. Williams neither testified at trial nor made himself available to claim investigators, nor could he be located for trial, despite Plaintiff's representation to Defendant throughout the claim investigation that the two were in contact. And Plaintiff produced no records, photographs or anything else from Mr. Williams that would prove such purchases ever occurred. Plaintiff had four years from the time he made his loss claim to the time of the trial to do so. He did not.

At trial, a jeweler testified Plaintiff had brought some pieces to him for appraisal several months before the claimed loss, and through that witness Plaintiff introduced appraisal forms for several pieces of jewelry establishing high value. But the appraisal forms noted no proof of ownership by Plaintiff of any of the pieces appraised, and the appraiser testified that if proof of ownership had been presented to him, he would have noted that ownership on any associated appraisal form.

Finally, the jury heard uncontroverted evidence that Plaintiff did not cooperate with several aspects of Defendant's investigation, which he was required to do as a condition of the policy. During the claim investigation, Plaintiff told Defendant he called ADT the morning after the reported burglary only to make sure the technician was coming to make repairs. But as discussed above, ADT records demonstrate Plaintiff called for a materially different purpose—to confirm his unit already had successfully reenrolled in ADT's monitoring system and to test it. Plaintiff also refused to answer Defendant's questions about his tax return filings, or non-filings, claiming a Fifth Amendment right not to incriminate himself.[3] By so refusing to answer, the jury heard, Plaintiff denied Defendant an avenue to confirm or disprove Plaintiff's financial ability to purchase and own the claimed jewelry of such substantial value.

Plaintiff also refused to answer the investigator's questions about the nature of his investments in medical marijuana dispensaries that, in the absence of any records to confirm them, similarly kept Defendant from verifying or evaluating his claims of income from those investments. Plaintiff also was shown to have concealed from Defendant, during its investigation, the active phone number for Plaintiff's live-in girlfriend at the time of the reported burglary, Ms. Brazile. The jury heard Plaintiff did this by providing Defendant an invalid number for Ms. Brazile while he used another number to regularly contact her throughout the investigation period, despite knowing Defendant wanted to

---

[3] While all individuals enjoy a right against compulsion to testify against oneself, the right cannot be used as both a shield and a sword. Plaintiff's invocation of his Constitutional right against self-incrimination does not excuse his contractual obligation to cooperate with the insurer's investigation of his claim.

contact her to confirm or disprove Plaintiff's representations about Plaintiff's income, ownership of jewelry, and what happened in their shared home on the night of the reported break-in. From the evidence on this issue alone, the jury could have concluded Defendant had no obligation under the contract to pay.

The Court is mindful that not every misstatement or failure to remember a fact, either clearly or at all, will serve as a basis for breach of the cooperation requirement of the insured. But demonstrably untrue statements about facts supremely material to a claim investigation, made at or near the time of the occurrence so as to be reasonably fresh in one's memory, clearly could constitute such a breach, as could conscious omissions of material information.

The jury had no evidence supporting Plaintiff's claims that he owned or had purchased the jewelry he claimed and voluminous evidence tending to disprove there was a theft. The uncontroverted evidence showed the burglary could not have happened as Plaintiff reported it. There was an utter lack of evidence of any purchases of the subject jewelry, a lack of proof of income sufficient to make such purchases, a lack of evidence that Plaintiff owned the jewelry he claimed beyond his own testimony, and a lack of evidence in some cases of even the existence of the jewelry at issue. Finally, the jury had before it substantial evidence of Plaintiff's non-cooperation with the investigation by omission, misstatement, and refusal to answer questions and provide valid, available contact information of witnesses, in breach of his obligations as insured under the agreement.

Against the weight of this evidence, it is highly unlikely a few passing mentions of Plaintiff's claims to have invested in a medical marijuana dispensary, or the fact that the Court instructed him to answer a question as to whom he invested through and how, triggered the jury's verdict for Defendant. In other words, it is far "more probable than not that the jury would have reached the same verdict if the evidence had not been admitted." *Jules Jordan Video, Inc. v. 144942 Canada, Inc.*, 617 F.3d 1146, 1159 (9th Cir. 2010). This is the standard for a proponent of questioned evidence to overcome a presumption of

- 8 -

prejudice. *Barabin*, 740 F.3d at 465. Defendant has met that standard. A new trial is not warranted.

### B. Evidentiary Error – Abuse of Discretion

Returning to the first factor in the new trial analysis, the Court finds the evidence Plaintiff complains of was properly admitted. As set forth above, Plaintiff urges in some places in his briefing that the Court erred in allowing any mention before the jury of his purported investments in the Arizona medical marijuana dispensary industry; in others Plaintiff urged the error specifically to be the Court's instruction to Plaintiff, in the jury's presence, to answer counsel's question about how he made such investments and through whom. The Court's analysis and conclusion is the same as to both formulations of charged error.

In investigating Plaintiff's claimed loss by theft of approximately $170,000 in jewelry, Defendant was entitled to satisfy itself, before paying on the claim, that Plaintiff in fact had the financial ability to purchase and own so much jewelry in the first instance. Because Plaintiff could not produce pay stubs, employment verifications, tax records, business agreements, bank records or any other records at all to substantiate claims of sufficient assets or income, Defendant was entitled to explore all claimed sources of income during its investigation of the claim. And because this investigation and its results constituted the defense in this case, all of Plaintiff's proffered claims of different sources of income were relevant to the jury's determination of 1) whether Plaintiff in fact had the ability to make the purchases he claimed to have made, and 2) Plaintiff's credibility, both to Defendant's investigator during the claim investigation process and at trial.

Plaintiff told Defendant's investigator he had invested in medical marijuana dispensaries in Arizona and was receiving returns on those investments as a source of income. Defendant introduced to the jury A.R.S. § 36-2806(A), which provides in relevant part that Arizona medical marijuana dispensaries "shall be operated on a not-for-profit basis." It was relevant and proper for Defendant to raise this contradiction before the jury to test Plaintiff's claim of income from an investment that Arizona law prohibits.

Moreover, it was relevant and fair for Defendant to test Plaintiff's claims that he invested into a new industry that is not only highly regulated but also the subject of close scrutiny by law enforcement, and he could produce no documentary evidence from that regulated entity showing such an investment.

For the same reasons that Plaintiff's claim of investment in medical marijuana dispensaries is relevant, so is his ability or inability to answer questions about the particulars of such investment. Where the likelihood of the investment even having occurred has been called into question as set forth above, a Plaintiff's ability to answer questions that flesh out the claimed investment—by identifying with whom he made the investment, what the terms of it were, how it was documented, and the like—bear on the credibility of his claim as well as his own credibility generally. The jury was entitled to know if Plaintiff could credibly substantiate his claims of investment income by supplying such critical supporting information. The information Defendant's questions sought was highly probative for purposes of a Fed. R. Evid. 403 analysis. These issues were all before the jury, and their probative value far outweighed any risk of unfair prejudice—which, as the Court finds, was minimal to non-existent.

Plaintiff argues, in the context of the Rule 403 balancing test, that undue prejudice was inherent in associating him in any way with the medical marijuana dispensary industry, and allowing evidence of his claimed investment in it was akin to making him look like a "drug dealer"—in essence, the evidence was being introduced to "dirty him up." (Tr. 09/18/17 at 74:23 – 75:10) The Court disagrees. First, in 2010, the citizens of Arizona voted by referendum to legalize medical marijuana in the state. *See* A.R.S. §§ 36-2801 *et seq.*, (the "Arizona Medical Marijuana Act") (effective December 14, 2010). That vote represented the will of a majority of the voters of Arizona. Plaintiff's argument that questions about his association with the operation of state regulated dispensaries of a substance which, subject to regulation, is and has been legal for nearly ten years under state law does not constitute prejudice before the jury.

Second, and more importantly, Defendant's argument was never that Plaintiff was involved in medical marijuana as an investor. To the contrary, Defendant's introduction of Plaintiff's claims—and the lack of evidence to support those claims—was intended to prove that Plaintiff had no such investments and thus no associated source of income, just as Defendant argued Plaintiff had no income streams from nightclub investments or any other source to support his claim of having sufficient assets to buy nearly $170,000 worth of jewelry. It was the theory of the defense that Plaintiff made up the investment and had no such associated income. When offered for this purpose, admission of the evidence does not constitute undue prejudice.

In any event, Plaintiff now urges it was error for the Court to instruct him to answer questions about the details of his claimed investment. The Court is particularly unpersuaded by such an argument when it gave the instruction at Plaintiff's counsel's urging.

At trial, Defendant's counsel questioned Plaintiff as to whether he failed to cooperate with the claim investigation by refusing to answer questions about his claimed dispensary investment. Plaintiff indicated he did not refuse to answer the question about his dispensary investment at his examination under oath. (Tr. 10/18/17 at 268:14-17.) Defense counsel reminded Plaintiff that he had told the examiner he had a confidentiality agreement that prohibited him from answering the examiner's question. (*Id*. at 18-21.)[4]

Defense counsel then asked Plaintiff, "Please tell the jury who the owner of the business is. Who do you work with in the medical marijuana dispensary?" (*Id.* at 268:24-169:1) Plaintiff answered, "I cannot say because it's a confidentiality agreement." (*Id.* at 269:2-3) At defense counsel's request, the Court instructed Plaintiff to answer the question, but then convened a sidebar before the witness could respond. At sidebar, Plaintiff's counsel indicated that while he did not know with whom his client had a confidentiality agreement, he was concerned that in answering the question, his client might be exposed to liability for violating such an agreement. The following exchange ensued:

---

[4] Plaintiff produced no such confidentiality agreement in discovery or at trial.

- 11 -

| | |
|---|---|
| 1 | Mr. Moring [Plaintiff's counsel]: Your Honor, if he has a contract with another party that says that—I mean, I guess if he's limited. |
| 2 | |
| 3 | |
| 4 | The Court: He's under oath in a federal trial. |
| 5 | Mr. Moring: Judge, I believe that he's—if he could just say— I don't know who it is but I don't want them coming in here and saying "Judge, if you stand here and tell him 'I'm telling you'—I have a contract and we have a confidentiality [agreement] and it has a court order provision in it." |
| 6 | |
| 7 | |
| 8 | |
| 9 | The Court: I understand your position now, which is not that he has the right to refuse to answer a question in this proceeding— |
| 10 | |
| 11 | Mr. Moring: --That's not my position, Judge. That he has a contractual obligation and— |
| 12 | |
| 13 | The Court: --it is just due to the Court's Order, not his voluntarily ignoring the— |
| 14 | |
| 15 | Mr. Moring: --that's exactly what my concern is. |
| 16 | |

(*Id.* at 269:13-270:5.) Plaintiff's counsel stated his concern that the record should be clear that Plaintiff answered questions about other persons with whom he invested in the dispensaries at the instruction of the Court and did not willingly violate any confidentiality term of an investment agreement. The Court obliged by then instructing the witness as follows: "Mr. Olsen, I will instruct you that as a matter of law, and under the authority of this Court you must answer that question." (*Id.* at 270:8-10.) Plaintiff's counsel sought the instruction. He cannot charge as error that which he invited.

Finally, Plaintiff initially argued in his Motion for New Trial that the Court erred in allowing any evidence of his statements that he invested in medical marijuana dispensaries because such investments post-dated his purchase of the jewelry that was the subject of the claims, and therefore any income associated with such investments was irrelevant to his ability to purchase the covered items. (Doc. 109 at 1–2.) This argument fails. Plaintiff's

Motion *in Limine* to preclude mention of the medical marijuana investments, as renewed at trial, never mentions this timeline argument. (Doc. 70.) Its sole focus is on the fact that medical marijuana is permitted under Arizona law and the argument that Defendant only raises the investment to associate Plaintiff with "drug sales." *Id*.

Despite Plaintiff's failure to raise the timing of the investment in temporal relation to the purchase of any jewelry, at oral argument on the motion the Court *sua sponte* raised the issue:

> THE COURT: Mr. Moring, is Plaintiff claiming he received income from his investment during the relevant time period—from his marijuana dispensary investment during the relevant time?

(Tr. 9/18/18 at 72:5-7). Plaintiff's counsel, presented with direct opportunity to adopt the argument that the dispensary investments occurred at a time that made them irrelevant to Plaintiff's available resources to purchase the jewelry, did not adopt this position. He simply continued to argue that associating Plaintiff with marijuana generally prejudiced him. Counsel's answer in full to the Court's inquiry about whether Plaintiff was arguing that the marijuana investment was at a time irrelevant to the inquiry into his ability to purchase, was as follows:

> MR. MORING: He did receive income from his medical marijuana investment, Your Honor, and the nature of that discussion was during his examination under oath so this is sworn testimony in front of Mr. Weisbarger, the prior counsel. And he talks about additional investments. He talks about he makes investments in what I could call speculative companies, start-up companies. He owned a nightclub. He talked about that. He also talked about his marijuana investment.
>
> So, Your Honor, the critical question is not whether or not Mr. Olsen had investments and investment income. I believe, and this is sort of a developing area of law, that's why I thought I would provide the Court with some guidance from the Utah district court that we have a specific issue here particularly with regard to medical marijuana. Those investments are legal under

> Arizona law and they have the serious potential to prejudice the jury.
>
> So much like you've suggested earlier about sanitizing things I think it's fair game for [the defense] to talk about investment income and he has investments. He makes money. However they want to go about that. The nature of those investments, particularly the marijuana investment, is not germane and has a significant chance of prejudice.

(*Id.* at 72:8 – 73:4.)

The Court went on to highlight the relevance of the claimed medical marijuana dispensary investments insofar as they demonstrate or fail to demonstrate an ability to buy over $168,000 worth of jewelry:

> I think that it's [the dispensary investment evidence is] germane because the jury is entitled to evaluate the credibility of that as a source for income when it is a business that one would expect certainly there being some kind of records on and the jury can evaluate from that whether or not that business or any other business, whether it's a nightclub or something else noncontroversial, is paying somebody in cash, and maybe sometimes that makes sense and maybe it doesn't, but they need the context to know whether that's the case.

(*Id*. at 74:5-13.) Again, Plaintiff's counsel made no mention of the timing of the investment being irrelevant, and focused only on the prejudice of Plaintiff being associated with marijuana:

> This is a particular subset of that cash investment business . . . . It's the mere mention—because it is to dirty him up. The idea about bringing that [dispensary investment] is this idea that Clinton Olsen is a drug dealer to dirty him up. To say that Mr. Olsen is an investor that receives income from his investments, fair game. I tried to make that clear in my motion *in limine* and it's this particular nature [dispensary investment] that I think is unduly prejudicial.

(*Id.* at 74:23 – 75:10.) Plaintiff thus did not raise the argument pre-trial that his dispensary investments were irrelevant because of their timing in support of his motion *in limine*. Nor

- 14 -

did he object at trial on that basis. He therefore has waived that objection and argument here. *See People of Territory of Guam v. Gill*, 61 F.3d 688, 693 (9th Cir. 1995); *Cotton ex rel. McClure v. City of Eureka*, 860 F. Supp. 2d 999, 1018 (N.D. Cal. 2012).

Moreover, as the Court entertained argument on Plaintiff's re-urging of his motion *in limine* at trial, it addressed precisely the concern Plaintiff did raise at trial and has raised again here—the avoidance of prejudice from mere association with medical marijuana or businesses involving it. The Court noted as follows:

> My concern is that the jury not hold any preconceived notions that they may have about the propriety of marijuana or medical marijuana against the Plaintiff in this case, not that any instruction would be some broad statement as to the legality or illegality of specific actions, either in the area of medical marijuana dispensary operation or anything attendant to that. . . . What the Defendant's asking me for is a statement of law as to the contours of the medical marijuana law. In other words, to say and carve out that territory of things that cannot be done. That is not what I intend to do. Plaintiff is asking me for a broad pronouncement that medical marijuana is legal and perhaps further than that. That is also not what I intend to do. I want to address the limited nature or limited purpose of the allowance of testimony and questioning on this issue, which is to say "you are not supposed to be thinking about policy considerations about whether medical marijuana is a good thing or not. That is not what this case is about." . . .
>
> My instruction is not about defining the contours of what you can do and can't do lawfully under the medical marijuana laws of Arizona. Mine is simply to make sure that the jury is not automatically hearing the word "marijuana" and imputing what is essentially a 404(b) problem, but focusing them on the [fact that] there is a legitimate reason for this to be questioned and that is to evaluate the credibility of the claim that this is income and this is traceable income. That's it.

(Tr. 10/18/17 at 14:18–15:11; 16:7-16.) Thereafter the Court denied Plaintiff's renewed motion *in limine* and Plaintiff testified on direct regarding his medical marijuana dispensary investment. At the conclusion of Plaintiff's direct testimony, the Court gave the following instruction to the jury:

- 15 -

> You have just heard testimony that Mr. Olsen had invested in a medical marijuana dispensary in Arizona and that he had advised [Defendant] that such investment was a source of his income. I instruct you to consider this evidence only for the limited purpose of evaluating the credibility of his claim of potential income. You're not to consider the propriety of medical marijuana dispensaries or any policy or moral questions surrounding medical marijuana. Those questions are not before you in this case and the claims and defenses at issue here do not involve that policy question.

(*Id.* at 136:19 – 137:2.) The jury, thus instructed, is presumed to have followed the law. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Any risk of the prejudice animating Plaintiff's motion *in limine* thus was ameliorated by the instruction.

### III. Conclusion

Plaintiff's purported investments in medical marijuana dispensaries were not the focus of Defendant's case. Defendant's counsel mentioned the topic once in opening statement, in passing, once during closing argument, and made it the subject of only a handful of questions to one witness during a trial that spanned five days. Rather, Defendant's focus overwhelmingly was on a dearth of records or other evidence to corroborate Plaintiff's assertion of the purchase, ownership and possession of almost $170,000 in jewelry and a highly implausible and at least partially disproven account of the theft of said jewelry. The Court did not abuse its discretion in admitting relevant information regarding Plaintiff's claimed investment. And admission of that evidence did not unfairly prejudice Plaintiff. Accordingly,

IT IS ORDERED denying Plaintiff's Motion for New Trial (Doc. 109).

Dated this 26th day of April, 2019.

Honorable John J. Tuchi
United States District Judge